UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH EMMANUEL GAXIOLA,

Plaintiff,

v.

E. BORLA, et al.,

Defendants.

Case No. 23-cv-02196-WHO

**ORDER ON THE MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 57

Joseph Gaxiola brings this suit against the California Department of Corrections and Rehabilitation ("the CDCR"), Salinas Valley State Prison ("Salinas Valley") and Pleasant Valley State Prison ("Pleasant Valley") (together, "defendants") alleging violations of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") based on his ongoing experiences while incarcerated in California state prisons. The CDCR has moved for summary judgment, arguing that he has not stated an ADA or Section 504 claim for discrimination but instead challenges the sufficiency of his medical care, for which there is no ADA or Section 504 remedy. The CDCR also asserts that there is no dispute of material fact that defendants provided access to adequate, non-discriminatory accommodations. Mr. Gaxiola raises issues concerning alleged inadequate medical treatment for his disabilities that do not state a claim for discrimination, and the CDCR's responses to his accommodation requests do not constitute disability discrimination. Accordingly, I GRANT the CDCR's motion for summary judgment.

## BACKGROUND

In 1995, while Mr. Gaxiola was incarcerated at Pelican Bay State Prison ("Pelican Bay"), a correctional officer shot him in the back of the head. Second Amended Complaint ("SAC") ¶¶ 2, 16. He has sustained long term brain damage resulting in chronic neurological conditions. SAC ¶ 2; Ko Decl. Exh. 2 [Dkt. No. 58-1] at 46. He suffers from grand mal seizures, eye trauma, and

United States District Court
Northern District of California

multilevel degenerative disc disease. Ko Decl. Exh. 2 [Dkt. No. 58-1] at 46; Exh. 3 [Dkt. No. 58-1] at 54. Due to old fractures in his fingers, Mr. Gaxiola also has chronic pain in his right hand. Ko Decl. Exh. 4 [Dkt. No. 58-1] at 56. His principal ailments are related to his seizures. Ko. Decl. Exh. 11, Salinas Valley State Prison Clinical Diagnoses [Dkt. No. 58-1] at 98–110 (detailing a history of more than 75 medical problems and clinical diagnoses, a dozen of which are titled "seizures," with many other related diagnoses). He additionally has significant vision and mobility impairments. Ko Decl. Exh. 5 [Dkt. No. 58-1] at 67.

The CDCR has a defined process for disabled incarcerated individuals to request accommodations. Some accommodations are provided automatically as a result of that person's disability "coding." As relevant to this case, there are four disability codes for individuals with mobility impairments. The most severe is "DPW," signaling that a person is wheelchair dependent. Ko Decl. Exh. 6, Armstrong Remedial Plan ADA Policies [Dkt. No. 58-1] at 79. According to CDCR policy, "[a]ll designated DPW inmates/parolees must be housed in a designated facility and require housing in a wheelchair accessible cell." *Id.*

A less severe code of "DPM" indicates that an individual is "mobility impaired" due to a permanent lower extremity impairment, but does not require a full time wheelchair. "All designated DPM inmates/parolees require housing in a designated facility but do not require housing in a wheelchair accessible cell. However, these inmates may require in-cell accommodation . . . ." *Id* (emphasis in original). An individual could also be coded as "DPO," which signals that an individual might need a prescribed wheelchair at times due to a disability apart from one caused by a lower extremity impairment—perhaps caused by a heart condition. *Id.* These individuals have similar mandatory housing needs as those coded as DPM.

Finally, an individual might be coded as "DNM," which is the designation for someone with permanent lower extremity mobility impairments who can walk up to 100 yards on flat ground without an assistive device, such as a cane. Lorey Decl. Exh. 26, Armstrong Remedial Plan Excerpt [Dkt. No. 57-2] at 12. There are no special housing requirements for DNM individuals. *Id.* At all times referenced in this litigation, Mr. Gaxiola has either had a disability code of "DPM," "DNM," or has had no code at all.

2

Individuals with an alleged disability may request further, non-mandatory, accommodations through the use of CDCR Form 1824. Lorey Decl. [Dkt. No. 57-2] at 3, ¶ 15. When an individual submits a Form 1824, it is reviewed by a panel of CDCR staff, called the Reasonable Accommodation Panel ("RAP"). *Id.* at ¶ 18. Although the panel may also include other experts, the RAP minimally includes the correctional facility's: (1) assigned ADA Coordinator or Associate Warden, (2) Chief Medical Executive or Chief Physician and Surgeon, (3) Health Care Grievance Coordinator, and (4) Health Care Compliance Analyst. *Id.* at ¶¶ 18–19. Once an individual has received approval from the RAP or a medical provider that he is allowed to use a specific accommodation, he is required to produce a document called a "chrono" when asked by a correctional facility staff member to demonstrate proof that the accommodation is permitted. Banegas Decl. Exh. 22, Childress Depo. [Dkt. No. 57-1] at 398–99, 404.

During his time incarcerated at the CDCR, Mr. Gaxiola has requested a number of accommodations using the Form 1824 for his varying medical conditions.[1] These accommodations include: "a walking cane; a hand brace/glove; a magnifier sheet; tinted prescription eyeglasses; a straw hat; a radio for the visually impaired; a clock for the visually impaired; and a typewriter for the visually impaired." SAC ¶ 4. He has also sought to be rehoused in what he refers to as an "ADA-accommodated cell," or a cell that is either wheelchair accessible or modified with accommodations such as grab bars or raised toilet seats. Ko Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 58-1] at 24 ("That's when I started to request to be put in an ADA cell."); Exh. 6 [Dkt. No. 58-1] at 79. Mr. Gaxiola contends that at least two physicians outside of CDCR have recommended that he be housed in a cell with "proper precautions . . . to prevent injury given pain and visual disturbances" related to his seizures, which he understands to mean an ADA-accommodated cell. Ko Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 58-1] at 23.

Regarding Mr. Gaxiola's preferred cell type, the CDCR (referring to the cells as "ADA wheelchair cells") explains that its ADA wheelchair cells are essentially the same as non-ADA

United States District Court
Northern District of California

---

[1] Mr. Gaxiola was incarcerated at Pelican Bay State Prison until July 2018, when he was transferred to Salinas Valley. SAC ¶ 23. He was transferred to Pleasant Valley in May of 2023. SAC ¶ 43. In June 2025, Mr. Gaxiola requested and was granted a transfer to Correctional Training Facility ("CTF"), where he is now. Banegas Decl. Exh. 2 [Dkt. No. 57-1] at 143, 147.

United States District Court
Northern District of California

cells, except they are larger and are modifed to allow a wheelchair-user ease of access. Lorey Decl. [Dkt. No. 57-2] at 3, ¶ 12. Not all CDCR institutions have these cells; they are typically reserved for individuals who are wheelchair-dependent, although they may serve as temporary housing for non-disabled individuals for needs that arise at the correctional facility. *Id.* at ¶ 14.

Although the CDCR notes that Mr. Gaxiola has never been formally diagnosed with any seizure disorder, neither has he been conclusively found to lack a seizure disorder. Dkt. No. 59 at 4; Banegas Decl. Exh. 3, Dr. Bright Depo. [Dkt. No. 57-1] at 166–69. As a result, Mr. Gaxiola's doctors at the CDCR have given him accommodations that would be appropriate for an individual with a seizure disorder. Banegas Decl. Exh. 23, CDCR Responses to Interrogatories [Dkt. No. 57-1] at 408–09 (including "bottom tier/bottom bunk chrono, durable medical equipment (helmet), and prohibitions against driving, working with heat or at heights."). The CDCR does not contest that Mr. Gaxiola has had seizures while living in CDCR custody. The parties dispute whether the CDCR's denial of Mr. Gaxiola's requested accommodations amount to discrimination.

Mr. Gaxiola first started experiencing grand mal seizures in 2007 but did not receive treatment until 2009. Ko Decl. Exh. 2, Gaxiola Medical Records [Dkt. No. 58-1] at 46. During that period, he suffered 12 concussions and experienced many headaches with increasing severity. *Id.* In 2022, Mr. Gaxiola twice experienced seizures in his cell that led to a fall with injuries severe enough that he was taken to the emergency room. Ko Decl. Exh. 8 [Dkt. No. 58-1] at 87; Exh. 9 [Dkt. No. 58-1] at 91. Following the incidents in 2022, Mr. Gaxiola testified that he requested "to be put in a [sic] ADA cell," but his requests were denied due to his status as a non-wheelchair user. Ko Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 58-1] at 21. The CDCR contends that Mr. Gaxiola never completed the required Form 1824 to make such a request, but that instead he asked his doctors to change his disability coding from DPM to DPW so that he would be moved to an ADA wheelchair cell as of right. Lorey Decl. [Dkt. No. 57-2] at ¶ 25; Gaxiola Depo. [Dkt. No. 57-1] at 27–28. His doctors did not change his coding.

Because Mr. Gaxiola uses a cane, he has also requested the use of a protective glove to alleviate pain caused by his previous hand injuries when he uses the cane. Although Mr. Gaxiola contends that Dr. Sui, his non-CDCR doctor, requested use of a specific protective glove (a

4

"wheelchair glove") on his behalf, *see* Exh. 10, Email Chain with Dr. Sui [Dkt. No. 58-1] at 96 ("He requested . . . gloves."), once Dr. Sui was informed by the Chief Physician & Surgeon at Salinas Valley that "wheelchair gloves" are not provided to cane users, Dr. Sui withdrew the specific request. *See id.* ("I know normally we only order glove[s] for [wheelchair] user[s]; [Mr. Gaxiola] has [a history] of fracture on the hand using the cane. He requested for [sic] gloves. I will let him know he is not qualified."). Following this denial, Mr. Gaxiola elevated his request to RAP, which authorized him to buy any desired glove "to cushion your hands to alleviate pain" from a pre-approved list of prison vendors, but did not approve his access to the specific "wheelchair glove" that he requested. *See* Exh. 10 [Dkt. No. 57-1] at 224 ("the ADA department will allow you the opportunity to look into the Maxi-Aid catalog for you to purchase gloves to alleviate your pain. Your request for a pair of gloves to cushion your hands to alleviate pain is approved with modifications.").

Mr. Gaxiola also requested the use of a specific clock/radio due to his visual impairments that he alleges make it difficult for him to use a typical radio. SAC ¶ 40. Some facts behind Mr. Gaxiola's current and previous access to the radio are disputed. At one point in time, Mr. Gaxiola was permitted to use the radio of his choosing. Ko Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 58-1] at 18 ("Sergeant Cervantes personally delivered me that radio and clock."). Although Mr. Gaxiola testified that the radio had been permitted at a previous institution and *that* is why Sergeant Cervantes gave him the radio, Sergeant Cervantes testified that he found out after-the-fact that "the radio and clock was not authorized, that the grievance was denied," and that he had mistakenly delivered the clock/radio to Mr. Gaxiola. Banegas Decl. Exh. 8, Cervantes Depo. [Dkt. No. 57-1] at 209–210. As relevant to this motion, though, when Mr. Gaxiola's radio was eventually lost (it is unclear whether it was taken by another incarcerated individual or removed by a CDCR employee), his requests for a similar replacement were denied because of CDCR policies precluding any individual from owning a radio that is "opaque, white, [with a] plastic case, and an external speaker" that exceeds weight restrictions and could be used as a weapon. Banegas Decl. [Dkt. No. 57-1] at ¶ 25; Mojica Decl. [Dkt. No. 57-4] at ¶ 7. RAP permitted Mr. Gaxiola to search for another radio suitable to his liking from one of the approved vendors.

Banegas Decl. Exh. 9 [Dkt. No. 57-1] at 218. Mr. Gaxiola declined to pursue this option. Gaxiola Depo. [Dkt. No. 57-1] at 69. The CDCR has provided Mr. Gaxiola with a digital tablet with radio access, which he currently uses. Lorey Decl. [Dkt. No. 57-2] at ¶¶ 27–33.

Another denied accommodation request concerned Mr. Gaxiola's preferred use of a limited mobility visibility vest. Incarcerated individuals are sometimes required to lay prone while outside on the yard in the event of an emergency or drill. Banegas Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 57-1] at 23. When that happens, individuals with mobility limitations are required to wear a "visibility vest" that allows correctional officers an easy way to know that those still standing during an emergency are allowed to do so. *Id.*; Banegas Decl. Exh. 8, Cervantes Depo. [Dkt. No. 57-1] at 204.

Mr. Gaxiola contends that he is unable to consistently wear his vest because he is prone to overheat when wearing it; overheating makes it more likely that he would suffer another seizure. Ko Decl. Ex. 1, Gaxiola Depo. [Dkt. No. 58-1] at 29. Instead, he prefers to have the vest with him in hand, but not physically wear it. *Id.* Correctional officers have been inconsistent in whether or not to enforce this particular rule when it comes to Mr. Gaxiola. Ko Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 58-1] at 30. On one occasion, a correctional officer asked Mr. Gaxiola to put on the limited mobility vest and he refused, citing his seizure-based disorder. *Id.* at 29–30. After going to the prison medical facility to request an accommodation, his request was denied. *Id.* at 29.

Because of his refusal to wear the vest, Mr. Gaxiola additionally relinquished his cane. *Id.* at 29–30. And, according to the grievance appeal he filed on the incident, the medical staff removed Mr. Gaxiola's ADA accommodations, including his need for the vest. Banegas Decl. Exh. 15 [Dkt. No. 57-1] at 283. Regardless, his cane was ultimately returned. Banegas Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 57-1] at 23. Mr. Gaxiola testified that correctional officers currently do not make him wear the vest. Ko Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 58-1] at 30.

Mr. Gaxiola's final contested accommodation involves his prescription tinted glasses.[2] On

---

[2] Although the CDCR raises Mr. Gaxiola's sun hat requested accommodation in its motion, Dkt. No. 57 at 18–19, Mr. Gaxiola does not argue that the CDCR's denial of his sun hat request amounts to disability discrimination.

June 26, 2024, Mr. Gaxiola attended a drug prevention class. He is required to attend these types of classes as a condition of his life sentence. Ko Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 58-1] at 40–41. During the class, the course instructor asked Mr. Gaxiola to remove his tinted glasses. He refused. Ultimately, he was removed from the class.

The CDCR contends that Mr. Gaxiola was asked to leave the class because of his "disruptive behavior" following his inability to produce a chrono with medical documentation of his need for tinted sunglasses. Banegas Decl. Exh. 22, Lt. Childress Depo. [Dkt. No. 57-1] at 402–5. Mr. Gaxiola states that he was removed *because* of his need to wear the glasses. He admits to raising his voice at the course instructor because of his frustrations, and claims that he told her that the chrono she wanted "was in the cell, but I told [the teacher] 'I can grab it to [sic] you." Banegas Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 57-1] at 78. By that point, however, Lieutenant Childress appeared and "just told [him] to leave." *Id.* Lieutenant Childress explained that tinted glasses are specifically disallowed in substance abuse classes without medical authorization because tinted glasses can be used to hide evidence that an individual is "under the influence." Banegas Decl. Exh. 22, Lt. Childress Depo. [Dkt. No. 57-1] at 404.

Mr. Gaxiola further testified: "[s]o I was kicked out of the class. [Lt. Childress] goes, 'As long as you're wearing your glasses, you cannot return to this class." *Id.* Mr. Gaxiola was subsequently written up and punished: his yard access was revoked for 20 days, his visitation privileges were removed, and the altercation was classified as a "Serious" incident. All of these punishments were eventually overturned. *Id.*

Mr. Gaxiola filed this lawsuit on May 5, 2023. *See* Dkt. No. 1. He was transferred to Pleasant Valley ten days later, where he remained until August 2025.[3] SAC ¶ 43; Dkt. No. 58 at 5. He alleges that while incarcerated at Pleasant Valley, his above-detailed requests for accommodation were not granted. SAC ¶¶ 43–47. He contends that he is unable to read, write,

_____

[3] Mr. Gaxiola is now incarcerated at the California Training Facility ("CTF"), as a result of his undisputed request to transfer for reasons of "available programs and personal preference." Dkt. No. 57 at 29. The contents of his complaint, however, refer only to his time at Salinas Valley and Pleasant Valley.

draw, move easily, or participate in jobs or daily activities within the prison because of the CDCR's refusal to accommodate his disabilities. SAC ¶ 47.

I was able to appoint counsel for Mr. Gaxiola after reviewing his amended complaint. *See* Dkt. Nos. 15, 18. Counsel filed the operative Second Amended Complaint alleging three causes of action against the CDCR, Salinas Valley State Prison, and Pleasant Valley State Prison.[4] Dkt. Nos. 19, 20, 26. Mr. Gaxiola alleges (1) Disability Discrimination under Title II of the ADA; (2) Disability Discrimination under Section 504 of the Rehabilitation Act; and seeks (3) Declaratory Relief as well as prohibitory and mandatory injunctive relief related to his experiences in the California prison system. SAC ¶¶ 48–81, Prayer for Relief. He contends that he "was improperly excluded from participation in, and denied the benefits of, prison services, programs, and activities on the basis of his disabilities" and that defendants have "acted and continue to act with malice or reckless indifference to [his] federally protected rights . . . by refusing to provide reasonable accommodations for his disabilities." SAC ¶¶ 57, 63, 72, 78.

On November 17, 2025, the CDCR moved for summary judgment on each of Mr. Gaxiola's causes of action. Motion for Summary Judgment ("MSJ") [Dkt. No. 57]. Mr. Gaxiola opposed the motion, and the CDCR replied. *See* Opposition to the Motion for Summary Judgment ("Oppo.") [Dkt. No. 58]; Reply in support of the Motion for Summary Judgment ("Reply") [Dkt. No. 59]. I held a hearing on the Motion on December 22, 2025, and allowed further briefing on two discrete issues. Both parties filed a supplemental brief. *See* Plaintiff Supplemental Brief ("Pl. Supp. Br."); Defendants' Supplemental Brief ("Def. Supp. Br.").

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of

---

[4] Mr. Gaxiola's originally filed Complaint and First Amended Complaint also listed individual prison officials as defendants, sued in their individual capacities. *See* Dkt. Nos. 1, 13.

persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

The CDCR moves for summary judgment on three grounds: (1) neither the ADA nor Section 504 provide causes of action for the type of relief Mr. Gaxiola seeks related to his CDCR doctors' medical decisions; (2) there is no dispute of material fact that Mr. Gaxiola's claims for ADA and Section 504 violations fail; and (3) Mr. Gaxiola's claims for injunctive relief are moot or barred by injunctions already in place as a result of the class action settlement agreement in *Armstrong v. Davis*, No. 4: 94-cv-02307-CW. Because I am granting summary judgment on the first two grounds, I do not address *Armstrong* in this Order.

### I.    The ADA and Section 504 do not provide relief for Mr. Gaxiola's challenged medical care treatments.

The ADA and Section 504 provide relief solely for disability discrimination as opposed to inadequate treatment of a disability. *See Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. Of L.A.*, 833 F.3d 1060 (9th Cir. 2016) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) (holding that the Rehabilitation Act, like the ADA, was never intended to apply to decisions involving

United States District Court
Northern District of California

medical treatment); *see also Zukle v. Regents of Univ. of Calif.*, 166 F.3d 1041, 1045, n. 11 ("There is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act."). The CDCR argues that Mr. Gaxiola does not bring a disability discrimination case but instead challenges the quality of the medical care he has received while incarcerated. MSJ 15–17.

In considering the difference between a claim of disability discrimination and one regarding the quality of medical care, *Rucker v. Trent* is instructive. No. 11-CV-4312-YGR, 2012 WL 4677741, *5 (N.D. Cal. Sept. 30, 2012). In *Rucker*, the Hon. Yvonne Gonzalez Rogers dismissed pro se plaintiff Vincent Rucker's ADA claim in which he alleged that prison physicians unlawfully denied his appeals for inmate accommodations relating to his request for a lower bunk assignment. Rucker specifically sought injunctive relief to require the defendants "to accommodate [him]" and "stop ordering [him] to climb up on an upper bunk[] when [he] cannot[] without suffering with these pains all the time." *See* Dkt. No. 1 (Complaint) *Rucker v. Trent et al.* at 4. Judge Gonzalez Rogers held that Rucker's claims concerning the prison officials' denial of his request for a lower bunk assignment amounted to "claims that Defendants were not providing proper care for his alleged disability." *Rucker*, 2012 WL 4677741, at * 5.

As in *Rucker,* many of the accommodations Mr. Gaxiola seeks are really challenges concerning whether the medical care provided by the CDCR is appropriate. He contends that he was denied "[a]ccess to safe, appropriate housing" because he was not provided with access to an ADA-accommodated cell. Oppo. 11–14. But despite his framing of the issue as one of "disability discrimination," Mr. Gaxiola actually challenges the CDCR's medical decision to (1) code him as DNM, and (2) house him according to his given disability code. This does not state a claim under the ADA and Section 504 because he is alleging "inadequate treatment for disability" and not "discrimination because of disability." *Simmons*, 609 F.3d at 1022.

The CDCR provides uncontested evidence that Mr. Gaxiola never filed a Form 1824 to

request an ADA-accommodated cell.  Instead, he asked his doctors to change his disability code from DNM to DPW so that he would be automatically eligible for that type of cell.  Lorey Decl. [Dkt. No. 57-2] at 4, ¶ 25; Banegas Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 57-1] at 27.  The CDCR doctors disagreed with his preferred coding.  And his outside doctors did not disagree with that conclusion.  They recommended only that "proper precautions [be put] in place to prevent injury" due to Mr. Gaxiola's medical history.  *Id.* at 30.  These precautions included not permitting Mr. Gaxiola to: swim alone, be submerged in a tub, work at heights that might result in a fall, or operate motor vehicles.  Banegas Decl. Exh. 20, Dr. Koshy Depo. [Dkt. No. 57-1] at 367, Exh. 21, Dr. LaBarte Depo. [Dkt. No. 57-1] at 382.   None of those recommendations included specific housing assignments or even what accommodations Mr. Gaxiola's cell should have outside of access to a bottom bunk.  Banegas Decl. Exh. 20, Dr. Koshy Depo. [Dkt. No. 57-1] at 374, Exh. 21, Dr. LaBarte Depo. [Dkt. No. 57-1] at 385, 388–89, 392.

Because neither party addressed *Rucker* at the hearing, I gave them the opportunity to file a supplemental memorandum.  After a brief attempt to distinguish *Rucker* from the instant case, Mr. Gaxiola concludes: "And Mr. Gaxiola is not challenging his medical treatment; rather he is challenging the denial of reasonable accommodations . . . that cause him to be discriminated against by being unable to access the same benefits . . . afforded to all other inmates because of his disabilities."  *Id.* at 3.  But he does not address that several of his requests for accommodation directly contrast with what any medical provider has recommended as being suitable for accommodating his disabilities.  To be sure, "failure to provide reasonable accommodation can constitute discrimination" under the ADA and Section 504.  Pl. Supp. Br. at 4 (citing *Weldeyohannes v. Washington*, No. 24-3821, 2025 WL 3685608, at * 4 (9th Cir. Dec. 19, 2025)).  But that does not mean that *any* denial of accommodation (including those where, as here, there is a reasoned medical basis for the denial of his preferred accommodation) must amount to actionable discrimination.

11

The CDCR's responsive supplemental briefing hits the mark.  Even if an individual refers to a claim as a "request for an 'accommodation' from his doctors," if what "he was actually seeking was to have them provide a *specific* treatment for his disability," that does not state a claim under the ADA and Section 504.  Def. Supp. Br. at 2 (citing to *Rucker*, 2012 WL 4677741) (emphasis added).  Because Mr. Gaxiola's request for a specific cell amounts to a request for a specific treatment for his disability denied by his doctors, he may not pursue an ADA or Section 504 cause of action to seek relief from the CDCR's decision.

Two of Mr. Gaxiola's additionally challenged accommodations follow a similar pattern to his preferred cell request: the protective glove and the mobility vest.  Both denials of these requested accommodations stem from unchallenged medical opinions and advised treatments for Mr. Gaxiola's disabilities.

Mr. Gaxiola's request for a specific protective glove was denied by the Chief Physician and Surgeon of Salinas Valley, Dr. Bright, because "[w]heelchair gloves are not given to patients using canes."  Ko Decl. Exh. 10, Email Chain with Dr. Sui [Dkt. No. 58-1] at 96.  Dr. Bright explained in deposition that the only medically issued gloves are "wheelchair gloves" and only those individuals who use wheelchairs are permitted to use them.  Banegas Decl. Exh. 3, Dr. Bright Depo. [Dkt. No. 57-1] at 165.  Mr. Gaxiola presents no medical rationale for why he should have been allowed access to that specific type of glove.  *See* Oppo. 14–16.  He argues that an outside doctor, Dr. Sui, requested a wheelchair glove for him.  But once CDCR explained that wheelchair gloves were only provided to individuals who used wheelchairs, Dr. Sui clarified the purpose behind the request (Mr. Gaxiola's history of fractures in his cane-using hand) and advised the CDCR: "I will let [Mr. Gaxiola] know he is not qualified."  Ko Decl. Exh. 10, Email Chain with Dr. Sui [Dkt. No. 58-1] at 96.

Consistent with Dr. Sui's reason for recommending the glove, the CDCR's RAP permitted Mr. Gaxiola to purchase a glove "to cushion your hands to alleviate pain" from an approved

12

vendor. He has chosen not to do so. *See* Ko Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 58-1] at 28 (explaining the grievance process and concluding "but I've already filed my lawsuit prior to leaving Salinas Valley State Prison, so I know it was just better to resolve it that way."). It is not disability discrimination to offer alternative gloves to cushion Mr. Gaxiola's hands to alleviate pain. Moreover, Mr. Gaxiola's failure to pursue those alternatives dooms his claim.

Finally, Mr. Gaxiola requests a specific medical accommodation concerning his preference to be allowed to decide whether to wear his limited mobility vest when on the yard or whether to simply have it in hand. When he sought a variance from medical staff, his request was refused, although, according to Mr. Gaxiola, any requirement that he wear the vest is now ignored by correctional officers. Ko Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 58-1] at 30. He offers no medically relevant evidence to rebut the CDCR's medical decision concerning his limited mobility vest. This again amounts to a challenge to "inadequate treatment for a medical disability" as opposed to a claim for "disability discrimination." *Simmons*, 609 F.3d at 1022. It fails to state a claim.[5]

> **II.     There is no material dispute of fact whether defendants discriminated against Mr. Gaxiola in violation of the ADA and Section 504 concerning his requests for a clock/radio and his removal from the drug awareness class.**

Given my conclusion that three of the five challenged accommodation denials are a direct result of (uncontested) medical treatment decisions, I turn now to Mr. Gaxiola's two remaining accommodations at issue: his request for a specific clock/radio and his removal from the drug

---

[5] Mr. Gaxiola's challenge to the CDCR's requirement that he wear a limited mobility vest during emergencies or drills on the yard also amounts to a challenge of a correctional facility's legitimate penological interests. *See Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008). Even without CDCR's medical decision on the issue, it is exceedingly unlikely that I could conclude that Mr. Gaxiola's requested exception, in light of the safety matters at issue, is a reasonable accommodation. *Id.* ("[D]etermining whether a modification or accommodation is reasonable always requires a fact-specific, context specific inquiry. This analysis permits a court to consider, with deference to the expert views of facility administrators, a detention or correctional facility's legitimate interests . . . in maintaining security and order and operating an institution in a manageable fashion.") (cleaned up) (citations omitted).

awareness class.

To defeat summary judgment on his ADA and Section 504 claims, Mr. Gaxiola must demonstrate that there is a genuine dispute of material fact that: (1) he is a "qualified individual with a disability;" (2) that he was "excluded from participation in or [] denied the benefits of the services, programs, or activities of a public entity, or [made] subject[] to discrimination by any such entity;" (3) because of "such disability." 42 U.S.C. § 12132.[6] The parties, although they have a different understanding of Mr. Gaxiola's medical conditions and diagnoses, do not contest the first prong. *See* Reply 1 ("Accordingly, for the purposes of summary judgment, Plaintiff's status as a disabled person is not at issue.") To that end, I focus my analysis on the latter two prongs. I conclude that, based on the facts in the record concerning Mr. Gaxiola's preferred clock/radio and removal from the drug safety course, he fails to present any issue of disputed fact that the CDCR discriminated against him because of any disability.

### A.    Denial of the Use of His Preferred Clock/Radio

Mr. Gaxiola says that at some point, the preferred radio he wished to use to accommodate his visual impairments was approved by the CDCR. Oppo. 16–17. The CDCR contests that assertion, and instead states that correctional officer Sergeant Cervantes, in an attempt to resolve a separate grievance issue with Mr. Gaxiola, agreed to give Mr. Gaxiola his preferred radio because he mistakenly thought it had already been approved. MSJ 10; Reply 2. In December 2023, after having the radio in his possession for several months, Mr. Gaxiola was moved off-site for a court proceeding and the radio was removed from his cell. MSJ 10; Oppo. 16. The CDCR declined to reissue Mr. Gaxiola with his preferred radio because it says it had never been approved in the first instance. MSJ 11.

Mr. Gaxiola contends that the CDCR's refusal to provide him with his preferred clock/radio denies him of his "benefit of access to a radio," Oppo. 17, but it is undisputed that Mr. Gaxiola *has* the benefit of access to a radio via the CDCR's tablet loan program.[7] His arguments

---

[6] Although Section 504 precludes the denial of benefits "*solely* by reason of [a person's] disability," the ADA precludes this same denial "*by reason* of such disability." *Compare* 29 U.S.C. § 794 (a) *with* 42 U.S.C. § 12132.

[7] I do not address whether radio access is a qualified "service, program, or activity" under the

seem to stem from his belief that it is unfair that one correctional officer mistakenly gave him an unapproved radio and that the radio was eventually removed and never returned. Oppo. 16. Mr. Gaxiola does not have any reliance interest in a radio—especially given the CDCR's clear penological interests in the type and model of radio that could be approved. *See* MSJ 19–20 (explaining that "only clear-cased radios, without external speakers, within certain size limits, from authorized vendors, are allowed at" Salinas Valley and Pleasant Valley); *see also Pierce*, 526 F.3d at 1217. Mr. Gaxiola's requested specific radio violates each of CDCR's requirements, and he has offered no evidence that the use of his tablet, which has a large screen to aid visibility and has access to radio, is an insufficient accommodation for his visual needs. Oppo. 16–17; MSJ 20; Lacey Decl. Dkt. No. 57-2 at 5 (explaining that Mr. Gaxiola was issued a tablet at each prison, and that he is "familiar with this technology"). I conclude that there is no dispute of material fact whether the CDCR discriminated against Mr. Gaxiola by precluding him from any "right of access to a radio" of his choosing: it did not.

### B. Access to drug prevention class while using prescribed tinted sunglasses

The final challenged issue is whether there is any dispute that Mr. Gaxiola's removal from the drug prevention class in June 2024 constituted disability discrimination. The CDCR first argues that "inmates have no entitlement to educational or vocational training." MSJ 21 (citation modified). It has long been understood that "there is no constitutional right to rehabilitation." *Hoptowit v. Ray*, 682 F.2d 1237, 1254–55 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995). But Mr. Gaxiola testified, and the CDCR does not contest, that as an individual serving a life sentence he is *required* to attend "self-help classes." Exh. 1 Oppo. Dkt. No. 58-1 at 40–41. If Mr. Gaxiola is required to attend these classes (or, presumably face consequences for failing to attend them), and is removed from the class because of his disability, he has at least a facially viable claim for violation of the ADA and Section 504.

But there are no material disputes of fact that allow that claim to survive summary judgment. Mr. Gaxiola contends that he was removed from the class *because of* his disability and

---

ADA, although I have seen nothing in the record to suggest that "access to a radio" writ large, is such a "service, program, or activity" available to all incarcerated individuals within CDCR.

15

United States District Court
Northern District of California

need to wear the prescribed tinted glasses.  Oppo. 19; Ko Decl. Exh 24 [Dkt. No. 58-1] at 175 (follow up report in which a counselor witness to the incident responded "Yes" to the question of whether the instructor "instruct[ed] [Mr. Gaxiola] to either remove [his] glasses or leave the class.").  He typically wore tinted glasses.  Ko Decl. Exh. 23 [Dkt. No. 58-1] at 172 (noting Mr. Gaxiola's receipt of "eyeglass frames" with "tint").  But there is no dispute that he did not have a chrono on hand to demonstrate the permissibility of wearing the tinted glasses when he was asked to produce it in the class.  Ko Decl. Exh 1, Gaxiola Depo. [Dkt. No. 58-1] at 78.  He got heated (or, in his words, "vociferous") when he was asked to provide proof that he was allowed to wear his sunglasses in class.  Banegas Decl. Exh. 1, Gaxiola Depo. [Dkt. No. 57-1] at 78; Banegas Decl. Exh. 22, Lt. Childress Depo. [Dkt. No. 57-1] at 401–2.  Lieutenant Childress then appeared and told him to leave the class.  Mr. Gaxiola was made to leave the class because of "disruptive behavior" for refusing to produce a chrono demonstrating his need for tinted sunglasses when asked by the course teacher, as required by CDCR policy, and raising his voice at her in the process.  Banegas Decl. Exh. 22, Lt. Childress Depo. [Dkt. No. 57-1] at 402.

Even if Mr. Gaxiola could demonstrate a factual dispute about the circumstances of his dismissal from the class, he cannot show that his dismissal was caused by the *sole* reason of his disability—this precludes any Section 504 claim from moving forward.  *See* 29 U.S.C. § 794 (a); *see also Baird ex rel. Baird*, 192 F.3d at 459–470.  Beyond that, he fails to demonstrate that his requested accommodation (being permitted to attend a drug prevention class while wearing tinted sunglasses without producing a valid chrono in contravention of the CDCR's policy) is reasonable in light of the CDCR's legitimate penological interests.  *See Pierce*, 526 F.3d at 1217.  The CDCR explains that (1) individuals are required to produce a chrono for tinted sunglasses in drug-prevention classes especially because of the risk that participants will be actively under the influence of drugs (and hiding it via the tinted glasses); and that (2) no individual is permitted to raise his voice at a course instructor without a consequence—here, being asked to leave the class.  Both of these interests are obviously related to "maintaining security and order" and "operating [an] institution in a manageable fashion."  *See Pierce*, 526 F.3d at 1217 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, n.23 (1979)).  In light of these legitimate penological interests, Mr. Gaxiola

16

cannot succeed on a claim that his removal from the drug prevention class amounted to disability discrimination pursuant to Section 504 or the ADA.

**CONCLUSION**

Accordingly, the CDCR's motion for summary judgment is GRANTED.  Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: February 6, 2026



William H. Orrick
United States District Judge

United States District Court
Northern District of California